UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TRUDY SPARKS,

       Plaintiff,

v.                                                                          Case No. 2:09-cv-14
                                                                            HON. R. ALLAN EDGAR
BELLIN HEALTH SYSTEMS, INC., a
Wisconsin Hospital Corporation, ERIC
ROSENKRANTZ, M.D. and BELLIN
MEMORIAL HOSPITAL, INC., a
Wisconsin corporate subsidiary of Bellin
Health Systems, Inc., Jointly and Severally

       Defendants.

_____/

## MEMORANDUM

Plaintiff Trudy Sparks brings this action for negligence, battery and violation of civil

rights under Michigan law against Defendants Bellin Health Systems, Inc. ("Bellin Health"), Eric

Rosenkrantz, M.D., and Bellin Memorial Hospital, Inc. ("BMH"). Her claims relate to her

allegations of sexual assault during a medical examination by Dr. Eric Rosenkrantz. This court

has jurisdiction over this matter due to the diversity of citizenship of the parties pursuant to 28

U.S.C. § 1332.

Bellin Health and BMH have both moved for summary judgment dismissal of all claims

against them. [Court Doc. Nos. 94, 108]. Plaintiff opposes the motions for summary judgment.

[Court Doc. No. 102]. The court has reviewed the arguments of the parties, the record, and the

applicable law and has determined that Defendants' motions will be **GRANTED**.

## I.      Background

The parties dispute many of the relevant facts relating to the allegations made by Plaintiff;

however, this court will view the facts in the light most favorable to the Plaintiff for purposes of this motion. Plaintiff's First Amended Complaint ("Amended Complaint") asserts that BMH employed Dr. Rosenkrantz as a cardiologist at its clinic in Iron Mountain, Michigan during the relevant time period. [Court Doc. No. 92, Amended Complaint, ¶ 4]. BMH is a wholly-owned subsidiary of Bellin Health. Amended Complaint, ¶ 5. Plaintiff argues that her claims arise in ordinary negligence rather than medical malpractice, and thus contends that she is exempt from the notification requirements of Mich. Comp. Laws § 600.2912.

On January 24, 2007 Plaintiff's primary care physician examined her due to her complaints of fatigue and chest discomfort. Amended Complaint, ¶ 9. The primary care physician referred Plaintiff to the Bellin Cardiology Clinic in Iron Mountain, Michigan. *Id.* Plaintiff describes her only office visit with Dr. Rosenkrantz in the following way:

> On January 24, 2007 Defendant Hospital's employee Defendant Rosenkrantz without any staff or other personnel present closed himself and Plaintiff Sparks in the examining room at Defendant Hospital's Clinic. At first, he told Plaintiff "I have a foot fetish; take off your shoes and socks."
>
> After examining her feet, Defendant Rosenkrantz began examining her back and told her: "You're not bashful, are you? Take off your shirt." He remained in the room alone with her while she disrobed and did not offer her a gown or robe or sheet. When Plaintiff told him she was cold and uncomfortable without a gown or robe or sheet, Defendant responded: "I only get uncomfortable when women are sitting here in their Victoria's Secret bras."
>
> He then began to rub Plaintiff's back telling her: "You have a lot of muscle spasms in your back, what you really need is a full body massage."
>
> Following this "examination" of her upper body, Defendant Rosenkrantz without preamble or permission unzipped Plaintiff's pants and moved his hands over her lower abdomen and down her pants several times, raising the waistband of her underpants and brushing her pubic hair with his hand while continuing with suggestive remarks.

Next Defendant moved around the table to Plaintiff's right side to perform an ultrasound apparently for gallstones or other abdominal complaints. When Plaintiff attempted to cover her breasts, he pushed her hands away, resting his hands on her breasts while he smeared gel over her chest and stomach. When she attempted to use tissues to clean the gel off her body, Defendant pushed her hands away and wiped the gel off himself.

Following the ultrasound, Plaintiff asked i[f] she could get dressed and Defendant assented but remained in the examining room watching while she put her clothes back on.

Following "examination" Defendant advised Plaintiff that he wanted her to undergo a treadmill stress test which was scheduled for January 29, 2007, along with an echocardiogram.

On January 29, 2007, during the echocardiogram Plaintiff asked the technician what to expect and mentioned some concerns about Defendant Rosenkrantz. Seeing Plaintiff was in distress, the technician asked, "What did he do to you?" and requested that Plaintiff talk with the Patient Advocate.

When this technician also described that Defendant Rosenkrantz had been known to step onto the treadmill behind female patients and embrace them during the "stress test" Plaintiff declined to undergo the treadmill test and left Defendant's Clinic. . . .

Defendant Hospital removed Defendant Rosenkrantz from his employment in Iron Mountain shortly thereafter.

Amended Complaint, ¶¶ 14-24. Plaintiff further alleges that during the examination, Dr. Rosenkrantz asked about whether her partner complained about her snoring and made other inquiries about her personal life. [Court Doc. No. 102-10, Deposition of Trudy Sparks ("Sparks Dep."), p. 95]. Plaintiff felt that he was asking about her "love life" and he further asked about whether she experienced stress in her life. *Id.* at 97. She also complained that he accepted several personal cellular phone calls while he was examining her. *Id.* at 100. He also inquired about a tattoo that she had on her back. *Id.* at 108-09.

Plaintiff provides evidence of Dr. Rosenkrantz's work environment prior to her medical

examination.  She includes typed notes from BMH Vice President of the Heart & Vascular

Center, Robert Fry, pertaining to his discussions with Dr. Rosenkrantz before he examined

Plaintiff.  He made notes pertaining to his interactions with Dr. Rosenkrantz on that day.  Those

notes indicate the following: "[d]iscussed some of the recent concerns regarding staff interaction,

counseled on appropriate methods of forming meaningful relationships, encouraged Dr. R to seek

out Tammy as the leader and review any questions he might have regarding performance directly

to her."  [Court Doc. No. 102-3]; *see also*, [Court Doc. No. 95-3, Affidavit of Robert W. Fry

("Fry Aff."), ¶ 1].  On October 3, 2006 Mr. Fry addressed "continuing concerns related to Dr.

Rosenkrantz's interaction with staff."  *Id.*

On February 1, 2007 Mr. Fry received news of the alleged assault on Plaintiff.  He made

notes pertaining to his interactions with Dr. Rosenkrantz on that day.  Those notes include the

following:

> I had requested a meeting with Eric Rosenkrantz MD regarding two primary
> issues of concern: a decline in the revenue and referrals from both Iron Mountain
> and Iron River and also continuing problems with interpersonal relations with the
> staff of Henke-Ryan.  I expressed a concern to both Rhonda and Ken that I was
> concerned the volume decline was a reflection of the declining personal
> relationships.  As can be seen from previous notes from Rhonda, there has been a
> pattern of problems between Eric Rosenkrantz MD and the clinic staff ever since
> his arrival in Iron Mountain. . . . I particular [sic] issue in addition to the decline in
> revenue that I wanted to review was the "sexual harassment" claim brought
> against Eric Rosenkrantz MD by a staff member of Dickinson Hospital.

[Court Doc. No. 102-3].  On that day, Mr. Fry also learned of Plaintiff's allegations of sexual

assault.  *Id.*  On February 7, 2007 Mr. Fry discussed Dr. Rosenkrantz's "verbal harassment" of

his staff with another doctor who worked with Dr. Rosenkrantz.  *Id.*

There are two specific comments that the record demonstrates Dr. Rosenkrantz made to

members of his staff that concerned Mr. Fry and Tamara Bilski, the office manager of the facility

in which Dr. Rosenkrantz practiced medicine.  Mr. Fry's notes state in relevant part:

> [Ms. Bilski] did describe two incidents of concern reflecting some questionable
> sexual behavior.  One incident had Eric [Rosenkrantz] requesting of a staff
> member to clean his "head," the assumption was that it would be his printer or
> some other mechanical device.  Eric [Rosenkrantz] told her to come back later in
> the day.  She did return and as she entered the office, Eric asked her to close the
> door and then asked her to drop to her knees.
>
> The other incident as [sic] Eric going into the all female billing office and stating
> you guys need a sausage down here. . . .

*Id.*  The notes further describe other incidents that made Dr. Rosenkrantz's staff uncomfortable

and that his nickname in the community was "Dr. Pig" because he was considered a "dirty old

man."  *Id.*

Following Plaintiff's complaint to the police, the Iron Mountain Police Department

launched a criminal investigation.  *See* [Court Doc. No. 102-4].  During the investigation, the

investigating officer spoke with an employee at another hospital who had an uncomfortable

interaction with Dr. Rosenkrantz.  *Id.*  Dr. Rosenkrantz grabbed the employee's wrist without her

permission to view a bracelet she was wearing more closely.  The employee filed a complaint

regarding his behavior with the hospital administration, and Dr. Rosenkrantz angrily telephoned

her seeking her last name to write her an apology letter.  *Id.*

Another woman working in the Cardiac Diagnostic Unit at Dickinson Hospital also

complained that Dr. Rosenkrantz telephoned her several times to obtain her last name.  [Court

Doc. No. 102-4].  The investigating officer also learned from Dr. Rosenkrantz's co-workers that

Dr. Rosenkrantz did not want a nurse to be present when he was examining female patients and

that he requested that female patients remove their shirts when he performed an echocardiogram

on them.  *Id.*  Ms. Bilski filed a statement in response to the police investigation which detailed

Dr. Rosenkrantz's rude and demeaning behavior towards other staff members.  *Id.*  She also

indicated that Dr. Rosenkrantz asked female patients to undress from the waist up and would not

provide them with any gowns with which to cover themselves.

Dr. Rosenkrantz's nurse also confirmed that Dr. Rosenkrantz joked with her about

"cleaning his head" and asked her to "get down on her knees."  He further interrupted her work

on one occasion and asked her to look at him because she had such beautiful eyes.  [Court Doc.

No. 102-4, p. 18].

In his deposition Mr. Fry indicated that he was aware of concerns relating to Dr.

Rosenkrantz's interactions with his staff, but that he did not "have any specific recollection of

any individual patient" who had expressed a problem with Dr. Rosenkrantz.  [Court Doc. No.

102-5, Deposition of Robert W. Fry ("Fry Dep."), pp. 22-23].  Another BMH administrator,

Rhonda Key, testified in her deposition that from July of 2006 to January of 2007 she had

concerns with the "business part" of Dr. Rosenkrantz's clinic, including "EKGs, practice of

relationships with patients, staff, teamwork." [Court Doc. No. 102-8, Deposition of Rhonda Key

("Key Dep."), p. 13].  A different health system administrator, the Team Leader for Business

Development who was responsible for recruiting, Kenneth Berndt, testified that he knew that Dr.

Rosenkrantz was not always respectful of his nurse at the Iron Mountain clinic and that he may

not have always acted in a respectful manner towards women in general, but he was not aware of

any other issues pertaining to Dr. Rosenkrantz.  *See* [Court Doc. Nos. 102-13, 102-16,

Deposition of Kenneth Berndt ("Berndt Dep."), pp. 4, 47, 49; [Court Doc. No. 102-14, Fry Dep.,

p. 10].  He was unaware of any concerns regarding asking female patients to disrobe for an EKG.

*Id.* at 51-52.

In his affidavit Mr. Fry recalled the knowledge he and other administrators had regarding Dr. Rosenkrantz's interactions with his staff and patients prior to Dr. Rosenkrantz's medical examination of Plaintiff. Fry Aff. His affidavit states in relevant part:

> Dr. Rosenkrantz began seeing patients in the Iron Mountain clinic in July 2006, at the commencement of his employment for Bellin. He was put on administrative leave immediately upon Bellin's receipt of notice of the Trudy Sparks complaint on February 1, 2007. He was terminated later that month for breach of his employment contract.
>
> To my knowledge at no time did Bellin Health Systems, Inc. or Bellin Memorial Hospital, Inc. receive any information suggesting that Dr. Rosenkrantz sexually harassed anyone, including any member of the Henke/Ryan office, any current or past patient, or any member of the public. Although the Henke/Ryan staff were in routine contact with us (in particular Ms. Key), at no time were any of the three of us (nor, to my knowledge, **any** member of Bellin) advised that anyone referred to Dr. Rosenkrantz as "Dr. Pig." At no time to my knowledge did anyone complain to us about his use of offensive language or of jokes made in poor taste.
>
> The concerns we were aware of involved interactions between Dr. Rosenkrantz and his staff, particularly an abruptness or intimidating attitude and a less tactful communication style than that to which the staff there was accustomed. The Henke/Ryan staff also had a concern about some testing Dr. Rosenkrantz routinely performed on patients at each appointment, tests that they thought might be unnecessary.
>
> My notes of February 1, 2007, do include a reference to a "sexual harassment claim brought against Eric Rosenkrantz MD by a staff member of Dickinson Hospital." Since there were never any complaints received by Bellin to my knowledge suggestive that Dr. Rosenkrantz had sexually harassed anyone, the only event that I could possibly have been referring to was the one that is described in the police report attributed to Ms. Judith Lally. It was reported to me that Dr. Rosenkrantz was interested in a bracelet that she was wearing and he abruptly grabbed her arm in order to bring her wrist into view. Ms. Lally was an employee of Dickinson County Memorial Hospital, and I believe the complaint was made to DCMH; and I believe we heard about it through the grapevine. I believe this event came to my attention not more than a week prior to February 1. In my notes I characterized this event as a "sexual harassment claim" although it did not to my memory involve any sexually offensive language or overtly sexual conduct.
>
> The complaints recited in the Police Report of foul language and sexual

innuendo were not reported to Bellin.

Fry Aff., ¶¶ 3-7.

On February 15, 2007 Mr. Fry sent a letter to Dr. Rosenkrantz terminating his employment agreement. *See* [Court Doc. No. 102-19]. The termination letter states that Dr. Rosenkrantz breached his employment agreement and refused to cure. It also informed him that, "Bellin was recently advised of multiple complaints from both patients and staff, including one complaint of inappropriate physical contact during an examination. Bellin has conducted an independent investigation into the merits of these complaints and finds the complainants to be credible." *Id.*

Defendant Bellin Health filed an affidavit of a board certified cardiologist, Louis Cannon, MD, in support of its motion for summary judgment. [Court Doc. No. 95-6, Affidavit of Louis Cannon, MD ("Cannon Aff.")]. He provided his opinion regarding the appropriateness of certain aspects of Dr. Rosenkrantz's examination of Plaintiff:

> Standards of practice do not require a patient chaperone or female attendant to be present during examination. Nor am I aware of any standard of practice requiring a cardiologist to post signs requiring that the patient be advised of a "right" to such a chaperone.
>
> I have reviewed the history and physical examination note written by Dr. Rosenkrantz concerning this patient's examination. The note is quite appropriate and indicates that the doctor did an appropriately complete examination. It was appropriate for the doctor to ask about her sleep patterns, whether she snores, and such things. It was and is appropriate to ask a 45-year-old patient whether she is sexually active, as that may affect whether, for example, a pregnancy test is required before the patient can be put on certain medications, whether the patient is on birth control, etc. It is certainly appropriate for a cardiologist to examine a patient's feet.
>
> It is not unusual to have patients disrobe during a cardiology exam, since some parts of the examination may require exposure to the patient's skin. When the patient has more than one piece of clothing on, it is sometimes difficult to determine through the clothing whether the sounds that you hear are because the

shirt is rubbing on a second piece of clothing, such as a bra.  Therefore, it is not unusual for the doctor to pull the patient's t-shirt up or unbutton the blouse in order to perform a chest exam.  I do not typically step out of the room when I ask female patients to unbutton their blouses.  And at times a patient's breasts must be moved or held out of the way.

        It is certainly appropriate during the exam that was performed here to examine the abdomen including the lower abdomen.  It was not unnecessary or inappropriate for the doctor to have been below the waistline of the patient's pants during the examination.

        Also, in residency, cardiologists are taught to stand behind a patient on the stress-test treadmill.  The doctors stand on the frame of the machine, straddling the moving track.  The treadmill is typically tilted upward, so that the patient is walking uphill; and the doctor stands behind the patient to steady the patient and does literally push against the patient to keep them moving forward "up" the moving tread.

Cannon Aff., ¶¶ 2-6.

Bellin Health further provided evidence that Dr. Rosenkrantz was credentialed successfully by three regional health systems and that his background was investigated in the manner that meets standards of practice for physician credentialing.  *See* [Court Doc. No. 95-10, Affidavit of Marita A. Hattem ("Hattem Aff.")].

Plaintiff's Amended Complaint states causes of action for negligence, battery, and violation of the Michigan Civil Rights Act, Mich. Comp. Law § 37.2303(a) ("MCRA").

## II.    Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway*

*Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822

F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R.

Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The

nonmoving party is required to come forward with some significant probative evidence which

makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822

F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to

make a sufficient showing on an essential element of the nonmoving party's case with respect to

which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v.

Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether

sufficient evidence has been presented to make the issue of fact a proper jury question, and not to

weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter.

*Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy

Street*, 822 F.2d at 1435-36.

III.     **Analysis**

A.     **BMH's Liability**

BMH joins in Bellin Health's motion for summary judgment and adds an additional

argument regarding why it should not be held liable for the actions of Dr. Rosenkrantz. BMH

argues that Plaintiff added it as a party after the statute of limitations had expired and that

Plaintiff's Amended Complaint which added BMH as a party does not relate back to the date of

the filing of Plaintiff's original complaint. BMH filed objections to Plaintiff's Amended

Complaint asserting its arguments regarding why Plaintiff should not be able to add it as an

additional party. [Court Doc. Nos. 104, 105].

BMH asserts that it is a separate entity from Bellin Health, and thus, Plaintiff did not file

her claims against it before the applicable statute of limitations expired. Further, BMH asserts

that Bellin Health made clear through the discovery process that it did not employ Dr.

Rosenkrantz. *See* [Court Doc. No. 105, p. 3]. Bellin Health further informed Plaintiff during

discovery that BMH was Dr. Rosenkrantz's employer. *Id.*

Under Michigan law the statute of limitations for a medical malpractice claim is two

years. Mich. Comp. Laws § 600.5805(6). Actions for injury to a person or property must be

brought within three years after the time of the injury. Mich. Comp. Laws § 600.5805(10).

Plaintiff filed her Amended Complaint adding BMH as a party on February 2, 2010. Her alleged

injuries occurred on January 24, 2007. Amended Complaint, ¶¶ 14-24. Therefore, even if only

ordinary negligence is involved, BMH contends that Plaintiff's claims are barred by the relevant

three year statute of limitations. *See* Mich. Comp. Laws § 600.5805(10).

Federal Rule of Civil Procedure 15(c) provides in relevant part:

> (1) ***When an Amendment Relates Back.*** An amendment to a pleading relates
> back to the date of the original pleading when: . . .
> (C) the amendment changes the party or the naming of the party against whom a
> claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided
> by Rule 4(m) for serving the summons and complaint, the party to be brought in
> by amendment:
> (i) received such notice of the action that it will not be prejudiced in defending on
> the merits; and
> (ii) knew or should have known that the action would have been brought against
> it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C).  However, the Sixth Circuit has also made clear that "'[t]he precedent of this circuit clearly holds that 'an amendment which adds a new party creates a new cause of action and there is no relation back to the original filing for purposes of limitations.'" *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010) (quoting *In re Kent Holland Die Casting & Plating, Inc.*, 928 F.2d 1448, 1449 (6th Cir. 1991)).  In *Ringrose v. Engelberg Huller Co., Inc.* the Sixth Circuit further noted:

> In Michigan and also under the federal rules, the filing of a complaint against a party stops the running of the statute of limitations as to the claims against that party but not as to new parties.  Michigan follows the principles stated in Federal Rule 15(c) that an amendment changing the party against whom a claim is asserted relates back if the party has received sufficient notice of the action so as not to be prejudiced in defending the case.  In *Forest*, the Michigan court following the reasoning of our decision in *Marlowe v. Fisher Body*, 489 F.2d 1057 (6th Cir. 1973), said: "While the above federal rule would allow the correction of misnomers, it will not allow the addition or substitution of new parties after the expiration of the statute of limitations."

692 F.2d 403 (6th Cir. 1982) (quoting *Forest v. Parmalee*, 231 N.W.2d 378 (1975)) (other citations omitted).

The Michigan Supreme Court has further confirmed that under Michigan law the amendment of a pleading to add a new party does not relate back to the original pleading unless the amendment serves to correct a technical error in naming the party.  *See Miller v. Chapman Contracting*, 730 N.W.2d 462, 464 (Mich. Sup. Ct. 2007).  In *Miller* the Michigan Supreme Court reminded the plaintiff that:

> " 'As a general rule, . . . a misnomer of a plaintiff or defendant is amendable unless the amendment is such as to effect an entire change of parties.' " The misnomer doctrine applies only to correct inconsequential deficiencies or technicalities in the naming of parties, for example, " '[w]here the right corporation has been sued by the wrong name, and service has been made upon the right party, although by a wrong name . . . .'" Where, as here, the plaintiff

seeks to substitute or add a wholly new and different party to the proceedings the misnomer doctrine is inapplicable.

*Id.* at 464-65 (quoting *Parke, Davis & Co. v. Grand Trunk Ry. Sys.*, 174 N.W. 145, 146 (1919) and *Wells v. Detroit News, Inc.*, 104 N.W.2d 767, 770 (1960)).

In this case it appears that Plaintiff's mistake in not adding BMH is more than merely a failure to correct a technical mistake. Bellin Health informed Plaintiff during discovery that it was not Dr. Rosenkrantz's employer and yet, she failed to correct her mistake and add BMH as a defendant prior to the expiration of the statute of limitations for negligence. *See* [Court Doc. No. 105]. Further, BMH is a separate corporate entity from Bellin Health. *See* [Court Doc. No. 110]. Plaintiff filed her original complaint on January 21, 2009 and waited over a year to amend the complaint to add BMH. Thus, it appears that BMH should be dismissed because the statute of limitations expired on Plaintiff's claims of negligence prior to the filing of Plaintiff's Amended Complaint. The Michigan Supreme Court has held that the division between corporate entities such as a parent corporation and its subsidiary will be respected unless there is evidence of fraud. *See Wells v. Firestone Tire and Rubber Co.*, 364 N.W.2d 670, 674 (Mich. Sup. Ct. 1985). Plaintiff presents no evidence of fraud with respect to the separation between Bellin Health and BMH.

However, even if Plaintiff's addition of BMH as a new party is proper and relates back to the filing of the original complaint, Plaintiff's claims against BMH should be dismissed for the reasons discussed *infra* relating to the dismissal of Bellin Health.

**B.      Bellin Health's Liability**

**1.      Employment of Dr. Rosenkrantz**

Bellin Health first argues that it cannot be liable for Dr. Rosenkrantz's actions because it was not his employer, as BMH, its wholly-owned subsidiary, was his employer. Michigan courts recognize the principle of vicarious liability under which " 'a master is responsible for the wrongful acts of his servant committed while performing some duty within the scope of his employment.'" *Rogers v. JB Hunt Transport, Inc.*, 649 N.W.2d 23 (Mich. Sup. Ct. 2002) (quoting *Murphy v. Kuhartz*, 221 N.W. 143 (1928)). Michigan courts also "recognize the general principle that in Michigan separate entities will be respected." *Wells*, 364 N.W.2d at 674; *VanStelle v. Macaskill*, 662 N.W.2d 41, 47 (Mich. Ct. App. 2003). However, when the distinction between a parent corporation and its subsidiary is invoked to "subvert justice," courts will ignore the fiction of the separation between the entities. *Wells*, 364 N.W.2d at 674.

In addition, the Sixth Circuit has recognized instances in negligence actions in which a parent corporation and a subsidiary corporation are so closely aligned in interest that the two companies cannot reasonably be distinguished. *See e.g. Bathory v. Procter & Gamble Dist. Co.*, 306 F.2d 22 (6th Cir. 1962).

In this action it appears that employees of BMH were responsible for hiring and managing Dr. Rosenkrantz. However, there are also some indications that Bellin Health and BMH were very closely aligned. *See e.g.* [Court Doc. Nos. 102-25, 102-24, 102-22, 102-21]. Because this court determines that it can award Bellin Health summary judgment due to its lack of vicarious liability for Dr. Rosenkrantz's actions and due to the court's determination that Plaintiff's claims sound in medical malpractice, the court declines to rule on whether Bellin Health is absolved from liability due to the fact that it was not Dr. Rosenkrantz's employer.

2.      **Vicarious Liability for Dr. Rosenkrantz's Actions**

Defendants argue that they are not liable for Dr. Rosenkrantz's actions because his alleged sexual assault of Plaintiff was not foreseeable. Plaintiff responds that Dr. Rosenkrantz's prior behavior towards his staff and other female hospital employees should have alerted Defendants to his tendencies towards women, including his patients.

Michigan courts have emphasized that employers are not generally liable for the tortious acts of their employees which are committed outside the scope of their employment. *See Salinas v. Genesys Health Sys.*, 688 N.W.2d 112 (Mich. Ct. App. 2004).; *see also, Cawood v. Rainbow Rehabilitation Centers, Inc.*, 711 N.W.2d 754, 756 (Mich. Ct. App. 2006); *McClements v. Ford Motor Co.*, 702 N.W.2d 166, 170 (Mich. Sup. Ct. 2005). In *Salinas* the court declined to find an exception to the general rule of nonliability in a situation in which the employee's opportunity to commit a sexual assault resulted from his position as a male nurse. The plaintiff alleged that the nurse was aided in committing the assault because of the existence of the agency relationship between the nurse and the defendant health care provider. 688 N.W.2d at 112-13. The court declined to create such an agency exception to the general rule under Michigan law, and indicated that the mere opportunity to commit an assault would not fit the exception, even if such an exception were recognized in Michigan. *Id.* at 113, 116; *Cawood*, 711 N.W.2d at 756-57.

The Michigan Supreme Court also declined to create such an exception in *Zsigo v. Hurley Medical Center*, 716 N.W.2d 220, 221 (Mich. Sup. Ct. 2006). The court in *Zsigo* reiterated its prior decision not to adopt an "exception to employer nonliability when a plaintiff can show that he or she relied on the apparent authority of the employee, or that the employee was aided in harming the plaintiff by the existence of the agency relationship between the employee and the employer." *Id.* at 224-227.

In *Brown v. Brown* the Michigan Supreme Court addressed employer liability for reasonably foreseeable behavior of an employee. 739 N.W.2d 313 (Mich. Sup. Ct. 2007). In that case the plaintiff was a security guard whose employer had assigned her to provide security for the defendant. An employee of the defendant raped the plaintiff at the defendant's facility. The defendant employee "had no prior criminal record, no history of violent behavior, and certainly no history indicating that he harbored a propensity to commit rape." *Id.* at 314. However, the defendant employee made several "crude, sexually explicit comments" to the plaintiff. The Michigan Supreme Court addressed whether the employer's knowledge of these comments established a basis for holding the defendant employer liable for the rape of the plaintiff. *Id.* at 314. The court held that the defendant employer was not liable for the rape of the plaintiff. It noted:

> We hold that where an employee has no prior criminal record or history of violent behavior indicating a propensity to rape, an employer is not liable solely on the basis of the employee's lewd comments for a rape perpetrated by the employee if those comments failed to convey an unmistakable, particularized threat of rape. . . . Because Brown did not commit prior acts that would have put his employer on notice of Brown's propensity to commit rape and Brown's workplace speech was not predictive of this criminal act, defendant cannot be held liable for the rape.

*Id.* at 314.

The court first determined that for a plaintiff to demonstrate negligence, she must show that a duty existed, a breach of the duty, causation, and damages. *Brown*, 739 N.W.2d at 316-17. In determining whether a duty exists, Michigan courts review the foreseeability of the harm to the plaintiff. *Id.* at 317. The Michigan Supreme Court in *Brown* determined that the employee's actions towards the plaintiff did not cause his ultimate rape of plaintiff to be foreseeable:

> It is argued that this rape was a foreseeable result of Brown's offensive speech.

> We disagree. Without question, Brown's words were crude and highly offensive. . . . However, an employer can assume that its employees will obey our criminal laws. Therefore, it cannot reasonably anticipate that an employee's lewd, tasteless comments are an inevitable prelude to rape if those comments did not clearly and unmistakably threaten particular criminal activity that would have put a reasonable employer on notice of an imminent risk of harm to a specific victim.

*Id.* at 318.

This court concludes that, as in the unfortunate situation in *Brown*, Dr. Rosenkrantz's alleged actions towards Plaintiff were not reasonably foreseeable to Defendants. Although Mr. Fry and other BMH administrators had knowledge of Dr. Rosenkrantz's tendency to be rude and disrespectful to his staff, it appears there was very little knowledge of even his tendency to make sexually inappropriate comments. *See* Fry Aff. ¶¶ 3-7. Aside from an instance in which Dr. Rosenkrantz grabbed the arm of a hospital staff member to view a bracelet more closely, there appear to have been no warning signs that he would sexually assault a patient. There is nothing in the record to suggest he attacked any other specific patients in an inappropriate manner.

Dr. Cannon provided affidavit testimony that it is not a required standard of practice to have a female chaperone when a cardiologist examines female patients. Cannon Aff., ¶ 2. Further, Defendants provide evidence that they examined Dr. Rosenkrantz's background in a manner that is standard for the medical profession. *See* Hattem Aff. Plaintiff does not provide this court with any evidence indicating that Dr. Rosenkrantz had a criminal history or a history of sexual harassment. As the Michigan court determined in *Brown*, merely because an employee has a tendency to make crude comments or verbally harass others does not mean that an employer is on notice that the employee has a proclivity to commit a sexual assault. *See* 739 N.W.2d at 316-18. It appears that the Defendants learned about the extent of Dr. Rosenkrantz's

inappropriate behavior after Plaintiff filed her police report as the most troubling aspects of his interactions with patients and staff became apparent pursuant to the police investigation. Following Plaintiff's complaints regarding Dr. Rosenkrantz and in response to other employment issues, Defendants terminated his employment contract. Dr. Rosenkrantz never examined Plaintiff again.

The court concludes that Plaintiff has not created a genuine issue of material fact regarding whether Defendants are vicariously liable for Dr. Rosenkrantz's actions. There is no evidence suggesting that Dr. Rosenkrantz's inappropriate examination of the Plaintiff was reasonably foreseeable to Defendants. Therefore, Plaintiff's claims of negligence will be **DISMISSED**.

### 3.     Whether Plaintiff's Claims Constitute Claims of Medical Malpractice

There is another reason why this court concludes that dismissal of Plaintiff's claims is appropriate. Although Plaintiff asserts her claims fall into the category of ordinary negligence, the court finds that Plaintiff's claims of sexual misconduct actually involve questions of medical judgment that fall within the realm of medical malpractice. Plaintiff failed to wait the necessary amount of time after filing her Notice of Intent and failed to file the requisite Affidavit of Merit for a medical malpractice claim. *See* Mich. Comp. Laws §§ 600.2912b, 600.2912d.

Michigan courts have made clear that:

[a] medical malpractice claim is distinguished by two defining characteristics. First, medical malpractice can occur only "'within the course of a professional relationship.'" Second, claims of medical malpractice necessarily "raise questions involving medical judgment." Claims of ordinary negligence, by contrast, "raise issues that are within the common knowledge and experience of the [factfinder]." Therefore, a court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim

pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience. If both these questions are answered in the affirmative, the action is subject to the procedural and substantive requirements that govern medical malpractice actions.

*Bryant v. Oakpointe Villa Nursing Centre*, 684 N.W.2d 864, 871 (Mich. Sup. Ct. 2004) (quoting

*Dorris v. Detroit Osteopathic Hosp. Corp.*, 594 N.W.2d 455, 465 (Mich. Sup. Ct. 1999)).

The primary consideration in analyzing claims of medical malpractice is whether the

alleged negligence "'occurred within the course of a professional relationship.'" *Bryant*, 684

N.W.2d at 871 (quoting *Dorris*, 594 N.W.2d at 465). In *Bryant* the Michigan Supreme Court

emphasized that "[a] professional relationship sufficient to support a claim of medical

malpractice exists in those cases in which a licensed health care professional, licensed health care

facility, or the agents or employees of a licensed health care facility, were subject to contractual

duty that required that professional, that facility or the agents or employees of that facility, to

render professional health care services to the plaintiff." *Id.* at 871 (citing *Dyer v. Trachtman*,

679 N.W.2d 311 (Mich. Sup. Ct. 2004) and *Delahunt v. Finton*, 221 N.W. 168 (1928)).

With respect to whether the claim involves questions of medical judgment, Michigan

courts ask:

If the reasonableness of the health care professionals' action can be evaluated by lay jurors, on the basis of their common knowledge and experience, it is ordinary negligence. If, on the other hand, the reasonableness of the action can be evaluated by a jury only after having been presented the standards of care pertaining to the medical issue before the jury explained by experts, a medical malpractice claim is involved.

*Bryant*, 684 N.W.2d at 872. In *Bryant* the Michigan Supreme Court determined that the failure

to keep an elderly patient from slipping between her bed rails and asphyxiating constituted

ordinary negligence rather than medical malpractice.  *Id.* at 430-31.  The patient had fallen

between the bed rails the day before her death, and the nurse assistants had informed the

supervising nurses that the patient was in danger of asphxiation.  *Id.*  In this situation, the court

found ordinary negligence in the failure to take steps to protect the patient:

> This claim sounds in ordinary negligence.  No expert testimony is necessary to
> determine whether defendant's employees should have taken *some* sort of
> corrective action to prevent future harm after learning of the hazard.  The fact-
> finder can rely on common knowledge and experience in determining whether
> defendant ought to have made an attempt to reduce a known risk of imminent
> harm to one of its charges.

*Id.* at 430-31.

In *Lee v. Detroit Medical Center*, a Michigan appellate court examined whether a failure

to report possible child abuse constituted medical malpractice or ordinary negligence.  775

N.W.2d 326 (Mich. Ct. App. 2009).  In determining that the failure to report the suspicion of

child abuse was a claim sounding in negligence and not medical malpractice, the court noted that

the abuse reporting statute applied to more than medical doctors and included such occupations

as social workers, school counselors, teachers, clergy members, and child care providers.  *Id.* at

333.  It thus determined that "because the same standard is applied to individuals outside the

medical field, the determination regarding whether there is reasonable cause to suspect abuse or

neglect does not require the use of medical judgment."  *Id.*

However, in *David v. Sternberg* the Michigan appellate court determined that plaintiff's

claim regarding treatment of her foot following a bunionectomy involved medical malpractice

rather than ordinary negligence.  726 N.W.2d 89 (Mich. Ct. App. 2007).  Plaintiff claimed that

the decisions regarding how tightly to dress her foot following her bunionectomy involved

ordinary negligence.  The court disagreed.  It determined that plaintiff's claims raised questions

of medical judgment involving how best to assess her condition, discern whether infection

existed, and treat her post-surgical condition.  *Id.* at 93; *see also*, *Steele v. St. Lawrence Hosp.*

*and Healthcare Servs.*, No. 283899, 2009 WL 1027208 (Mich. Ct. App. Apr. 16, 2009) (question

involving whether psychiatrist properly conducted breast examination on mental health patient

was a claim of medical malpractice rather than ordinary negligence).

The parties appear to agree that the alleged claims arose during the course of a

professional relationship.  Therefore, the first prong of the medical malpractice test is satisfied.

Plaintiff asserts that her claim in this case involves ordinary negligence and did not involve any

medical judgments.  Defendants disagree.  In support of their assertion that Plaintiff's claims

involve questions of medical judgment, the Defendants have filed an affidavit of a practicing

cardiologist, Dr. Louis Cannon.  Cannon Aff.  Dr. Cannon's affidavit asserts that many of the

actions taken by Dr. Rosenkrantz that Plaintiff found offensive were actually medically

appropriate.  *See* Cannon Aff., ¶¶ 2-6.  He confirmed that cardiologists do not always have

chaperones when examining female patients.  *Id.* at ¶ 2.  He further noted that a cardiologist's

questions regarding sleep patterns, snoring, and sexual activity would also be appropriate.  *Id.* at

¶ 3.  According to Dr. Cannon, examining a patient's feet is appropriate, as well as asking a

patient to disrobe for a chest exam.  A physician may also need to hold a patient's breasts out of

the way or touch a patient's lower abdomen.  *Id.* at ¶¶ 4-5.

Plaintiff does not provide this court with any expert affidavits refuting Dr. Cannon's

conclusions.  Plaintiff seems to maintain merely that a lay jury can assess Plaintiff's allegations

regarding Dr. Rosenkrantz's medical examination without the assistance of expert testimony

regarding medical judgment. At first glance, it appears that many of Dr. Rosenkrantz's alleged actions were inappropriate within the context of a medical examination. However, the court concludes that at least some of the actions may be explained by resort to medical testimony regarding an appropriate cardiology examination. While a layperson may not generally believe a cardiologist needs to examine a patient's feet or ask about her sexual activity, when viewed in the light of Dr. Cannon's affidavit, it appears that there may be legitimate medical reasons for probing such areas during a cardiology examination. A lay jury would necessarily benefit from expert testimony regarding an appropriate cardiology examination rather than being left to formulate its own uneducated opinion. Therefore, because this court finds that Plaintiff's claims raise at least some questions involving medical judgment, it concludes that Plaintiff's claims involve questions of medical malpractice rather than ordinary negligence. *See e.g.*, *Steele*, 2009 WL 1027208. As Plaintiff has failed to comply with waiting period requirements and affidavit of merit requirements of malpractice claims, her claim of negligence must be **DISMISSED**.

### 4. Plaintiff's Public Accommodations Claim Pursuant to the MCRA

Plaintiff asserts in her Amended Complaint that BMH is a place of public accommodation and that she was denied the full enjoyment of its facilities and services on the basis of sex in violation of the MCRA, Mich. Comp. Laws § 37.2302(a). The MCRA also provides that:

> Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
> (i) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.

(ii) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing.

(iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

Mich. Comp. Laws § 37.2103(i).

In *Dockweiler v. Wentzell* a Michigan appellate court discussed whether a patient at a county mental health facility had stated a claim under the MCRA for sex discrimination in the use of a public accommodation. 425 N.W.2d 468 (Mich. Ct. App. 1988). In that case a staff psychologist sexually assaulted the plaintiff over a series of months. *Id.* at 469. Plaintiff brought several claims against the mental health facility, including a claim for violation of her civil rights under the MCRA. In affirming the award of summary judgment in favor of the health facility on the MCRA claim, the court noted:

Our review of plaintiff's complaint discloses that plaintiff did not sufficiently allege a claim for the denial of the full and equal enjoyment of a public service, i.e., any service provided to the public by ACMHS or Allegan County. Paragraphs one and two of plaintiff's complaint reveal that plaintiff was indeed given access to services at a mental health clinic; was given the full opportunity to use the services provided to the public; and was in fact provided with treatment by a staff psychologist at the clinic for a period extending over eleven or twelve months. That plaintiff was sexually abused by her assigned staff psychologist during her treatment does not necessarily suggest that she was also denied the public services provided by ACMHS due to prejudices and biases against her because of her sex.

*Id.* at 470.

Similarly, in this action Plaintiff does not assert that anyone at BMH or Bellin Health denied her services at their health care facility. Nor does she claim that anyone threatened to

deny her health care services if she did not submit to Dr. Rosenkrantz's sexual assault. Plaintiff

voluntarily chose not to return to Dr. Rosenkrantz for the stress test following her initial

appointment with him. Unlike the plaintiff in *Dockweiler* plaintiff did not endure months of

sexual assault culminating in coerced sexual intercourse. Plaintiff's MCRA claim fails because

there is no evidence creating a genuine issue of material fact regarding whether submission to

sexual assault by Dr. Rosenkrantz was made a condition of her receipt of medical services.

The record further reveals that Dr. Rosenkrantz never examined Plaintiff again and that

Defendants never denied Plaintiff services following her visit with Dr. Rosenkrantz. Defendants'

motion for summary judgment regarding Plaintiff's MCRA claim will be **GRANTED**.

### IV.     Conclusion

For the reasons explained *supra*, Plaintiff's claims against Defendants Bellin Health and

BMH will be **DISMISSED**. Defendants' motions for summary judgment will be **GRANTED**.

A separate judgment will enter.


_____ */s/ R. Allan Edgar*_____
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE